UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-14074-CR-CANNON/MAYNARD

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

SHANNIMA YUANTRELL SESSION,

    Defendant.
_____/

## DEFENDANT'S POSITION PAPER ON SENTENCING AND REQUEST FOR A DOWNWARD VARIANCE

COMES NOW defendant, Shannima Y. Session, by and through his appointed counsel, Kafahni Nkrumah, pursuant to Federal Rule of Criminal Procedure 32, Local Criminal Rule 88.8, and USSG § 6A1.2(b), and submits the following position with respect to sentencing in this case.

## SENTENCING POSITION PAPER

Mr. Session respectfully request this court take into consideration all the 18 USCA § 3553(a) factors and sentence him to a sentence of four-hundred and twenty (420) months, to be followed by a term of supervised release. Mr. Session believes that this sentence is sufficient, but not greater than necessary to achieve the purposes of sentencing within 18 USC § 3553(a).

Mr. Session would like this court to be aware that his life experiences are not being offered to this court as an excuse for his conduct. It is being offered as

mitigation evidence, which United States Supreme Court case law, and statutory authorities clarifies, "… is not being provided as an excuse or justification for engaging in criminal conduct, but rather for the purpose of mitigation as to the length of sentence or type of punishment to be imposed as a result of that criminal conduct." See *Lockett v. Ohio*, 438 U.S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); See also, 18 U.S.C. § 3661 and 21 U.S.C. § 850.[1]

### *The Offense Circumstances*

On October 20, 2020, Mr. Session was arrested by the Highland County Sheriff's Office on an unrelated matter. While Mr. Session was in jail pending, pending resolution of those charges, a federal grand jury in the Southern District of Florida returned a sealed ten-count indictment against him on December 15, 2022, for offenses related to sex trafficking after a three-year investigation. [ECF Dkt. #1].

The government alleged that between the years of 2011 and 2019, Mr. Session trafficked (prostitution) eight women and three minor females in the Highlands County, Florida areas of Sebring, Avon Park, and Lake Placid. It was alleged that Mr. Session used manipulation to exploit these women's vulnerabilities, from homelessness to drug addiction. It was also alleged by the government that Mr. Session used physical violence to get the women to comply with his demands. [See final PSI pg. 5, ¶3].

---

[1] Evidence about the defendant's background and character is relevant because of the belief, held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable for sentencing purposes than those who have not had such experiences. *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, concurrence).

Mr. Session's was subsequently arrested and bought into federal custody, and he initially appeared on the ten-count indictment in the Southern District of Florida on June 12, 2023, before the Honorable Judge Shaniek Maynard. [ECF Dkt. #11].  On June 20, 2023, Mr. Session was arraigned on the indictment, of which Mr. Session entered a plea of guilty to all the charges. [ECF Dkt. #16].  On December 14, 2023, Mr. Session was reindicted on an 11-count superseding indictment [ECF Dkt. #103]. He was arraigned on the superseding indictment on December 18, 2023, where he once again entered a plea of not guilty. [ECF Dkt. #108].  On September 10, 2024, Mr. Session began his jury trial in the SDFL.  On September 20, 2024, at the conclusion of the jury trial, the jury found Mr. Session guilty on all counts. [ECF Dkt. #194].

### A.   *Mr. Session's Personal Circumstances*

Mr. Shannima Y. Session is a forty-seven-year-old, African American man, born in Highlands County, Fl., into a troubled situation and dysfunctional family. Mr. Session' parents, Mr. John E. James and Ms. Roslyn Session were not married when Mr. Session was born.  Mr. Session states that he never had a relationship with Mr. James.  According to Mr. Session, his biological father is Leslie James Portee, and not Mr. James, although James' name is on the birth certificate.  He learned this when he was an elementary school student.  He further states that his biological father was incarcerated for most, if not all, of his childhood, and he didn't have a relationship with him, or even speak with him, until he was sixteen years old, and they have never developed a close relationship.

In speaking with Mr. Session, he talked about his life living with his mother and his "stepfather," Mr. Otis Cheatem.  "I was my mother's only child, although I

have at least nine paternal half-siblings. Growing up, things were rough. My mother struggled financially to make ends meet. There were times when the lights would be out, and although we would have food and clothing, we moved around a lot. My mother was an alcoholic, and she didn't really take care of me. My great-grandmother, Ms. Mandy Hicks, was more like my mother than my mother. I could go to my great-grandmother, and she would protect me from my mother, and she would also make sure that I had eaten, and I was good."

"My mother would discipline me excessively, since I was a little boy. She would beat me with anything she could get her hands on, and she would beat me for anything. It was nothing for her to break skin and draw blood when disciping me for acting like a little kid, which I was. My mother was an alcoholic, but she was also on drugs for most of my childhood. Before I was taken into foster care, I would see men, drug dealers, coming and going from the house all the time. I always thought that my mother was selling herself for the drugs because she didn't have any money to pay for them and I would always see the men coming in and out of the house. In looking back, I think the thing that hurt me the most is the fact that my mother could have gotten me out of foster care if she completed the classes mandated by children services and she wouldn't do the classes."

"My mother would take me to my Aunt Betty's house and leave me there at least two weekends a month, and sometimes every weekend. It was at Aunt Betty's were I first learned about and saw drug dealing, as she was the first person to bring

4

crack cocaine to Lake Placid. Things got so bad with the beatings that I went to school one day and showed my teachers, and then I was placed in foster care."

"My mother's boyfriend, Mr. Otis Cheatam, was with my mother from when she was pregnant with me until around 1988, when they broke up. He was a manager at a pool hall, but his real occupation was pimping. I also know that he was pimping my mother out until they broke up in 1988, and I saw him pimp out other women. My relationship with him was good, but I didn't see him as a father figure, even though he had been in my life since birth. I know that he and my mother would fight, even though I wouldn't see them fighting all the time, I would always hear it, and I would see my mother all bruised up afterwards."

"I was molested at around seven or eight years old by a couple of cousins who were just three and four years older than me. At age fifteen, I started dating this older woman, who was nineteen at the time, and, in the life, prostitution. I was with her until I was eighteen years old and that's what she did to help support herself and help me survive. Although I have been around prostitution all my life, I really learned the prostitution game from her."

"I've been in the streets from an early age. I started selling drugs at thirteen years old. I first started selling weed that I would get from my family to the white kids in the neighborhood. I've seen people shot in the streets and have had friends murdered. I've witnessed people being beaten, robbed, and assaulted. This was in every neighborhood that I had ever lived in with my mother. It was in every foster care home neighborhood that I lived in. It was always a part of my life. I remember

5

an incident when I was robbed at gunpoint, I was fourteen years old. After being robbed, I called the police to report the robbery. They took me home to my foster mother's house because I had been reported missing and never did anything about the robbery."

In speaking with one of Mr. Session's brother's, Mr. Onterial Clark, he talks about his brother's rough upbringing. "My brother had a tough childhood. His mother would beat him really bad sometimes. She also didn't really take good care of him and I can remember them not having lights on at there house and also moving a lot because of his mother not paying the rent. I know that he went into foster care when he was about nine years old and staying in foster care until he aged out, but Shannima was in the streets at an early age. He was exposed to more than what a child should have seen. It's not an excuse, but I hope that this Judge will show some mercy and not sentence him to life."

### B. 18 U.S.C. § 3553(a) in considering Mr. Session' sentence.

The mandate of 18 U.S.C. § 3553(a) is, of course, for the court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in paragraph Two of that same statute. In *United States v. Chavez*, 584 F.3d 1354, 1364 (11th Cir. 2009), the Eleventh Circuit summarized the factors that a sentencing court must consider:

> "Post *Booker*, the imposition of a sentence by the district court in a criminal case … involves a two-step process. First, the district court must still determine the appropriate sentencing range under the guidelines. This step includes the consideration and application of applicable departures as authorized by the Guidelines or statute. Second, the district court must then consider the various factors

> enumerated in 18 U.S.C. 3553(a) in ultimately arriving at a reasonable sentence.

See also, *United States v. Talley*, 431 F.3d 784, 787 (11th Cir. 2005) ("The § 3553(a) factors include: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the kinds of sentences available; (6) the sentencing guidelines range; (7) pertinent policy statements of the Sentencing Commission; (8) the need to avoid unwanted sentencing disparities…. .

In Mr. Session' case, it is the circumstances of his current offense, the circumstances of his life, and his personal characteristics that justifies a sentence of four-hundred and twenty months, with a period of supervised release to follow.

### A. 3553(a) Factors

This Court's obligation to consider carefully, the 18 U.S.C. § 3553(a)(2) factors need for Mr. Session' sentence to "reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and also "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, is an obligation that is imposed by law. 18 U.S.C. § 3553(a)(2).

Excessively long sentences, however, fail to reflect the seriousness of the offense, undermine respect for the law, and fail to provide just punishment. *See United States v. C. R.*, 792 F.Supp.2d 343, 516 (E.D.N.Y. 2011) ("A sentence must be

7

proportional to the defendant's crime. A sentence that is disproportionately long in relation to the offense is unjust and fails to promote respect for the law); *see also United States v. Rogers*, 960 F.2d 1501 (10th Cir. 1992) (A sentence must be proportionate to the crime committed, and if the sentence is so disproportionate to the crime as to shock the moral sense of the community, the sentence is impermissible). There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist. *See United States v. Marshall*, 870 F. Supp. 2d 489, 491 (N.D. Ohio 2012) (While a five-year mandatory prison term may be less cruel than life in prison, as applied in cases like this one, it may well constitute "cruel and unusual punishment.").

In an infographic entitled "How Someone Becomes a Trafficker," the author puts forward sample life events and experiences that push or pull a person into becoming a trafficker.[2] "You can read a lot about what makes someone vulnerable to exploitation and the stages of grooming. But there is little discussion on what brings people to exploit others and what can be done to prevent these types of people from becoming exploiters…."

The infographic goes on to look at three areas that they believe contribute to how traffickers are groomed to exploit others. The first is exposure:

---

[2] Mariah Long, How Someone Becomes a Trafficker, End Slavery Now, Jan. 7, 2016, http://www.endslaverynow.org/blog/articles/how-someone-becomes-a-trafficker

8

> "Growing up around exploitation desensitizes people and normalizes abuse. What's seen as commonplace is eventually viewed as destiny."

The infographic then quotes a former trafficker, "For me, sexual abuse was a bit like secondhand smoke." The second factor is Heritage:

> "Many times, it is as simple as joining the family, or community business."[3]

The infographic, in quoting another former trafficker, "My dad was a pimp. My granddad was a pimp. At 13, I was told that I was going to be a pimp." The final factor is Opportunity:

> "If there is a lack of well-paying jobs in a community, quick money is incredibly appealing. Without other options, easy money from trafficking breeds a pool of traffickers."

In quoting the last former trafficker, "I would see their [other traffickers] late model cars, houses, money. They [trafficking victims] mean income. They mean merchandise."[4]

In an article, "What Fuels Human Trafficking, the author looks into why people tend to end up trafficking others, and what is being done to stop people from being traffickers.[5] In looking at some of the causes of human trafficking, the author points towards social/systemic inequities:

> "… Lastly, systemic inequities and disparities make certain groups much more vulnerable to exploitation. Mass displacement, conflict, extreme poverty, lack of access to education and job opportunities,

---

[3] *Id.*
[4] *Id.*
[5] Hannah Gold, What Fuels Human Trafficking, Unicef, Jan. 13, 2017, http://www.unicefusa.org/stories/what-fuels-human-trafficking

violence and harmful social norms … are all factors that push individuals into situations of trafficking. Families living in extreme poverty or families in desperate circumstances are more likely to accept risky job offers…."[6]

1. **The Possibly Effects of Mr. Session's Childhood Trauma**

Trauma is a profound experience of the loss of security and welfare evoking feelings of fear, helplessness, harrow, and possibly disorganized agitation in children.[7] The description of PTSD in the Diagnostic and Statistical Manual of Mental Disorders has increasingly taken into account child-specific features of PTSD, and PTSD has evolved from a disorder first associated with Vietnam veterans in the 1970's [8] to one which has now been well documented in the general population at an estimated 7 - 12%.[9]

And in specific groups of children, particularly high-risk children such as adolescent delinquents, an estimate of PTSD in the population of children and adolescents is still forthcoming but is believed to be much higher than that of the general population. Dr. VV Ruchkin,[10] in a study that he has conducted, has pointed out that twenty-five (25) percent of adolescent delinquents met DSM-III PTSD criteria and forty-two (42) percent fulfilled partial PTSD criteria, percentages

---

[6] *Id*.
[7] American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders. 4th edition. Washington, DC, USA: American Psychiatric Association; 2000.
[8] Card JJ. Epidemiology of PTSD in a national cohort of Vietnam veterans. Journal of Clinical Psychology, 1987; 43 (1):6-17 [Pubmed]
[9] Kessler RC, Sonnega A, Bromet E, Hughes M, Nelson CB Posttraumatic stress disorder in the national comorbidity survey, Archives of General Psychiatry. 1995;52(12):1048-1060.
[10] Ruchkin, V.V.; Schwab-Stone, M.; Koposov, R.; Vermeiren, R.; Steiner, H., Violence exposure, posttraumatic stress, and personality in juvenile delinquents, 41 Journal of the American Academy of Child and Adolescent Psychiatry, 322-329 (2002)

comparable to and exceeding those found in the population of Vietnam veterans, suggesting the vulnerability of childhood or adolescent experiences and the subjective nature of trauma.

The latest DSM-IV-TR outlines the diagnostic criteria for PTSD following the occurrence of a traumatic event, including symptoms for longer than one month of (1) reliving the trauma, (2) avoiding associations related to the trauma, and (3) increased arousal resulting in "clinically significant distress or impairment in social, occupational, or other important areas of functioning."[11]  The description is keen to note the impact of childhood development on the triad of symptoms; for instance, in children, the response to the trauma may be expressed as disorganized and agitated behavior rather than intense fear, horror, and helplessness, and the reexperiencing may be expressed through repetitive play with traumatic themes, frightening dreams without recognizable meaning, and trauma-specific reenactment.[12]

Children may suffer trauma in many significant ways including developmental delays; numerous social, behavioral, and academic difficulties; somatic complaints; lower self-esteem; and attachment issues.[13]  As an anxiety disorder, one may imagine PTSD to be a source of strife for the victim and perhaps close a circle of contacts.  However, rather than being a quietly contained disorder,

---

[11] Pooja L. Amatya and Drew H. Barzman, ISRN Pediatrics, The Missing Link between Juvenile Delinquency and Pediatric Posttraumatic Stress Disorder: An Attachment Theory Lens (2012) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3384893/
[12] Id.
[13] Trickett, PK, McBride-Chang, C.,

11

the violence and chaos experienced by the victim through trauma may manifest as outward acts of aggression, delinquency, and conduct disorder behaviors and the like may be considered as symptoms of PTSD, rather than isolated problems.[14]

In an electronic mental health newsletter by Dr. Joel I. Kimmel P.H.D., he speaks about "The Traumatic Effects of Abandonment" and its effects if not properly treated:

> "…Weather they were abandoned by parents who were not present, parents who were present but emotionally unavailable, or have been abandoned in relationships later in their lives, the effects can be quite devastating.  Abandonment by a significant person leads to an sense of loss of love and connectedness.  In early life, being cared for, being important to others and being wanted is critical.  When rejection or abuse occurs, the message to the person is that they are not important and that they have no value.  In children, this loss of psychological and physical protection leads to internalized chronic fear and shame.  Imagine, if you will, growing up and living your life with the belief that you are not wanted and that you are worthless.  How do you go on in life with these beliefs?  In many adopted children, the ability to attach to others during the formative years is corrupted and many grow up to be adults who are untrusting of others and believe that they don't matter.  Often, they develop a 'me against the world attitude.'"[15]

Dr. Kimmel goes on to talk about abandonment actually able to occur at any time during a person life cycle.  He goes on to describe how an abandoned person feels going through the process mentally:

> "…Abandonment also includes an aloneness not by choice, feeling isolated even in relationships, feeling deserted by others, feeling not accepted by society because of gender or race….

---

[14] Pooja L. Amatya and Drew H. Barzman, ISRN Pediatrics, The Missing Link between Juvenile Delinquency and Pediatric Posttraumatic Stress Disorder: An Attachment Theory Lens (2012) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3384893/

[15] Joel I. Kimmel, P.H.D., The Traumatic Effects of Abandonment!  An Electronic Mental Health Newsletter from Joel I. Kimmel, Ph.D., Vol. 10, Number 7 (2015), https://kimmelpsychology.com/the-traumatic-effects-of-abandonment/

> Being abandoned is a situation that is taken personally. Those who have been abandoned believe that the abandonment was made by a person important to them who CHOSE to leave them, to reject them. It causes a person to feel that they are unwanted, unimportant, and basically don't matter. Shame and low self-esteem accompanies abandonment. Consequently, it can be lifelong as many individuals spend their lives trying to disprove those beliefs. They often enter into poorly chosen relationships which either ultimately end in rejection or dependence upon the person to whom they are looking for acceptance. However, they basically don't trust others and have difficulty being open and intimate. They will often turn to addictive behaviors such as drinking and drugging to numb themselves to feel better. Abandoned people often become depressed and anxious with many fears as they lack confidence and a sense of identity. Many constantly look for any signs of potential rejection and can make excessive emotional demands in relationships. …"[16]

In another online medical newsletter, MedicalNewsToday, an article that was medically reviewed by Timothy J. Legg, Ph.D., CRNP and written by Jayne Leonard, What to know about abandonment issues, gives the reader a short and concise understanding of the effects of abandonment, especially in children. The author is clear to state that, "fear of abandonment is not a standalone mental health condition, such as depression, but it is a form of anxiety and even a phobia in some senses."[17] The author goes on to write about the effects of abandonment on those children who have been experienced the loss of a parent:

> "In severe cases, such as those in which a child has experienced the loss of a parent or caregiver, they may develop unhealthy ways of coping, such as: addiction, disordered eating, lashing out at others, either physically or verbally, and self-harm.[18]

---

[16] *Id*.
[17] Jayne Leonard, medically reviewed by Timothy J. Legg, Ph.D., CRNP, What to know about abandonment issues, MedicalNewsToday, Feb. 26, 2020, https://www.medicalnewstoday.com/articles/abandonment-issues
[18] *Id*.

13

Mr. Session has not been evaluated and diagnosed with any mental disorders despite the fact that he has been prescribed medication twice for undiagnosed conditions and he has not been diagnosed for PTSD.  But if we were to look at some of the more traumatic events of his life, from his childhood, his life in the streets, and his adult life, these factors, as well as others, more than add up to the chances of Mr. Session being diagnosed with PTSD.

Also being exposed to environments rife with poverty and violence, to include the factors that are most conducive to juvenile delinquency such as parental psychopathology, drug usage, neighborhoods with criminal subculture, low employment participation, frequent mobility among residents, and poor school conditions, these factors are factors that are conducive to juvenile delinquency, as well as trauma.  Mr. Session's exposure to very traumatic experiences in his early life, coupled with the mental disability that he has suffered from since early childhood, are certain to have had a detrimental effect on his decision making, then as well as now as an adult, and should be considered by this court.

**Other 3553(a) Considerations**

The United States Sentencing Commission report, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), supports Mr. Session's request for a sentence of four-hundred and twenty months, with a period of supervised release to follow.  The findings of the Sentencing Commission's report, Figure 14, shows that the reconviction rate of offenders at the time of their release is highest among offenders who are younger than twenty-one at the time of their release, at 48.5%,

and those between the ages of twenty-one to twenty-four years old at 48.4%. These percentages declined in each subsequent age grouping, with those who are between 65 years or older old at time of release being at 6.5%. Figure 15 in the same report also shows that the reincarceration rate by age at the time of their release was highest among those between the ages of 21 to 24 years old, at 38.6%, and declined in each subsequent age group, with those between the ages of 65 or older at 4.1%. The report also shows that time to reincarceration expands with age and the severity of reincarceration offense declined with age.[19]

      Mr. Session would also respectfully request that this Court take into consideration the findings in the United States Sentencing Commission, *Measuring Recidivism: Criminal History Computation of the Federal Sentencing Guidelines* (2004), exhibit 9 shows that those in the age group of over 50 at the time of sentencing, who fall in criminal history category VI, have a recidivism rate of 41.1%, as compared to those, for example, in the 21 to 25 years of age bracket with a CHC VI who recidivate at a rate of 68.1% and those in the 31 to 35 year of age bracket and who are a CHC VI who recidivate at a 59.3%.[20]

      When balancing the 3553(a) factors and the possible health consequences from incarceration, these factors also cuts in favor of his request for a sentence of four-hundred and twenty months, with a period of supervised release to follow. Mr. Session' health, including his mental health, are factors that this court can consider

---

[19] The Effects of Aging on Recidivism Among Federal Offenders (Published Dec. 7th, 2017) can be found at: www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders

[20] The Sentencing Commission's report, including Exhibit 9, can be found at: http://www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_Criminal_History.pdf.

15

in fashioning a sentence. In a study in the Annual Review of Sociology[21] the authors documented a negative relationship between incarceration and a divers set of health conditions. For example, incarceration is associated with high levels of self-reported illnesses and the experience of incarceration (exposure) generally has a greater effect on health than the length of incarceration. Aside from general health conditions such as physical functioning, studies in this area have considered various distinct conditions, including infectious disease, cardiovascular disease, and formerly incarcerated person have an elevated risk for these chronic health conditions compared with the general population.[22]

And the effect of prisons on a person's mental health have been well documented. In an online article by the Prison Policy Initiative entitled, Research Roundup: Incarceration can cause lasting damage to mental health, the article talks about the debilitating effects of incarceration:

> We often talk about the disturbingly high numbers of people with mental health disorders locked up in prisons and jails. But less attention is paid to the ways in which incarceration itself perpetuates this problem by creating and worsening symptoms of mental illness. Research shows that, while it varies from person to person, incarceration is linked to mood disorders including major depressive disorder and bipolar disorder.
>
> The carceral environment can be inherently damaging to mental health by removing people from society and eliminating meaning and purpose from their lives. On top of that, the appalling conditions common in prisons and jails — such as overcrowding, solitary

---

[21] M. Massoglia and W.A. Pridemore, Incarceration and Health, 41 Annual Review of Sociology, 291-310 (2015), https://doi.org/10.1146/annurev-soc-073014-112326

[22] *Id.*

16

confinement, and routine exposure to violence — can have further negative effects. Researchers have even theorized that incarceration can lead to "Post-Incarceration Syndrome," a syndrome similar to PTSD, meaning that even after serving their official sentences, many people continue to suffer the mental effects.[23]

Counsel is not requesting a variance based on Mr. Session mental health difficulties pursuant to USSG 5K2.13, but he respectfully ask that the court take into account the mental stresses that prions places on a person in conjunction with some of the other stressors placed on the body because of incarceration. These reasons can also justifiably enter into this Court's sentencing decision. *See, e.g., United States v. Gray*, 453 F.3d 1323, 1325 (11th Cir. 2006) (A defendant's age, his prior minimal criminal record, and his medical condition are all valid considerations at sentencing because they relate to the history and characteristics of the defendant); *United States v. Foster*, 2012 WL 2863252, *5(N.D. Ill. 2012) ("At his original sentencing hearing, the Court found Foster's health concerns and his desire to rehabilitate his life to be mitigating factors taken into account pursuant to Section 3553(a).").

## Conclusion

Sentencing courts are, of course, charged with the responsibility of treating those that come before them as individuals. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for

---

[23] K.R. Quandt and Alexi Jones, Research Roundup: Incarceration can cause lasting damage to mental health, Prison Policy Initiative, (2021), http://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/

the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). Courts are charged by Congress, as well, to impose a sentence that is sufficient, but not greater than necessary to fulfill the goals of sentencing established by Congress. *See* 18 U.S.C. § 3553(a).

Mr. Session respectfully requests this Court to follow that tradition and impose a sentence of four-hundred and twenty months, with a term of supervised release to follow. This sentence is "sufficient, but not greater than necessary," to achieve the purposes of sentencing set forth in § 3553(a).

2. **Requests for Recommendations**

Mr. Session respectfully requests a sentence in a facility as close to the Southern District of Florida as possible so that it will be easier to maintain family visits.

Respectfully submitted,

HECTOR DOPICO
FEDERAL PUBLIC DEFENDER

By:   *s/Kafahni Nkrumah*
Kafahni Nkrumah
Assistant Federal Public Defender
Special Bar ID #A5502967
109 North Second Street
Fort Pierce, Florida 34950
Tel: 772-489-2123
E-Mail: Kafahni_Nkrumah@fd.org

18

## **CERTIFICATE OF SERVICE**

I HEREBY certify that on January 14, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: _s/Kafahni Nkrumah_
      Kafahni Nkrumah